## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>SOMETHING SWEET ACQUISITION,<br>INC., *et al.*,<br><br>      Debtors. | Chapter 7<br><br>Case No. 21-10992 (CTG)<br><br>(Jointly Administered) |
| PETERSON FARMS, INC., *et al.*,<br><br>      Plaintiffs,<br><br>v.<br><br>SOMETHING SWEET ACQUISITION,<br>INC., *et al.*,<br><br>      Defendants. | Adv. Proc. No. 23-50752 (CTG)<br><br>**Related Docket No. 1** |

## <u>MEMORANDUM OPINION</u>

Something Sweet, the debtor in these bankruptcy cases, manufactured baked goods and sold them to grocery stores.[1]  The plaintiffs in this adversary proceeding are the sellers of agricultural products.  They sold their perishable agricultural products, on credit, to Something Sweet.  As of the time the debtors filed these bankruptcy cases on July 2, 2021, plaintiffs Peterson Farms and the Program were owed (collectively) approximately $285,000 (in principal) for unpaid invoices –

---

[1] D.I. 76 at 3.  Plaintiff Peterson Farms Inc. is referred to as "Peterson Farms."  Plaintiff First Call Trading Corp. is referred to as "the Program."  Peterson Farms and the Program are referred to collectively as "plaintiffs."  Debtors Something Sweet Acquisition, Inc. and Something Sweet, Inc. are referred to either as "Something Sweet" or the "debtors."  Defendants Loeb Term Solutions, LLC and Capital Equipment Solutions, LLC are referred to collectively as the "Loeb Entities."

approximately $300,000 when prepetition interest is included.[2]  The chapter 7 trustee

in the bankruptcy case is holding a total of approximately $455,000, most of which

represents the proceeds of the sale of the debtors' assets.[3]  If interest on the plaintiffs'

claims continues to run post-petition, the amount of their claims as of now – more

than four years after the bankruptcy was filed – exceeds the $455,000 that the trustee

has.

The Loeb Entities have a valid, perfected security interest in all of the debtors'

assets.  The question in this adversary proceeding is one of priority.  Plaintiffs claim

that, under PACA, all of the funds now held by the trustee are held in statutory trust

for their benefit.[4]  The Loeb entities offer six different reasons why, notwithstanding

PACA, they are entitled to the proceeds in the trustee's possession.  They argue: (1)

the plaintiffs have waived PACA's protections by effectively consenting, through their

course of dealing, to the debtors paying their invoices more than 30 days after delivery

of the produce, which under PACA operates as a waiver of the statutory trust; (2) that

any PACA trust that may have existed was broken before the plaintiffs' shipments in

question (such that assets held by the debtors as of that date were not held in trust);

(3) certain funds that the trustee holds fall outside of any trust that may exist; (4) the

application of PACA to grant the plaintiffs priority over their security interests would

---

[2] *See* Peterson Ex. 2; The Program Ex. 5.

[3] D.I. 76 at 6.

[4] The Perishable Agricultural Commodities Act of 1930, as amended, 7 U.S.C. §§ 499a-499t, is referred to as "PACA."

violate their rights under the Constitution's Due Process and/or Takings Clauses; and (5) plaintiffs are not entitled to attorneys' fees or interest.

Based on the evidence presented by the parties at a one-day trial on August 15, 2025 and the arguments advanced by the parties following trial and in post-trial submissions, the Court concludes that all of the funds now held by the trustee are held in statutory trust for the benefit of the plaintiffs. One can certainly have a fair conversation about whether granting the suppliers of perishable agricultural products priority over those who make valid secured loans to their customers is wise policy. At least in theory, that should operate in the long run to raise the cost of credit for those customers, which could (again, in theory) have harmful consequences for the sellers of agricultural products. That policy question, however, is one for Congress rather than this Court. Applying the law as it is to the factual record before the Court, the funds that the chapter 7 trustee is holding are held in trust for the benefit of the PACA claimants. Those claimants are accordingly entitled to those funds.

### Factual and Procedural Background

While the parties argue about what inferences one should draw from the historical facts, the events at the core of this adversary proceeding are mostly not disputed.

1.    **Peterson Farms**

Peterson Farms, a Michigan-based produce supplier, is a licensed produce dealer under PACA.[5] It began doing business with Something Sweet in (or around)

---

[5] Aug. 15, 2025 Hr'g Tr. at 30.

May 2019.[6]  It made three shipments of cherries between April and June of 2021, sending Something Sweet invoices on April 12, May 18, and June 23 for $42,800, $43,319, and $43,753, respectively.  These invoices totaled $129,872.[7]  Each invoice stated that the "perishable agricultural commodities listed on the invoice are sold subject to the statutory trust authorized by Section 5(c) of the Perishable Agricultural Commodities Act, 1930 (7 U.S.C. [§] 499e(c))."[8]  The invoice adds that the "seller of these commodities retains a Trust claim over these commodities, all inventories of food or other products derived from these commodities, and any receivables or proceeds from the sale of these commodities until full payment is received."[9]  The invoices state that the payment terms are "Net 30" and that Peterson Farms charges a "finance charge calculated at the rate of 1½% per month (18% annually)."[10]

As of May 18, 2021, the April 12 invoice remained outstanding (as did a prior invoice from March 2021).  Kevin Knight, a collection specialist for Peterson Farms, emailed a contact at Something Sweet to follow up on those outstanding invoices.[11]  On June 22, Knight emailed others at Peterson Farms to report on his conversation with the Chief Financial Officer of Something Sweet.  The email reported that Something Sweet was in financial distress and that it expected to sell its business,

---

[6] Aug. 15, 2025 Hr'g Tr. at 40.

[7] Peterson Ex. 1.

[8] *Id.*

[9] *Id.*

[10] *Id.* (omitting the use of all caps in the original).

[11] Loeb Ex. 5.

4

with the sale anticipated to close on July 9, 2021.[12]  The email reported that Peterson Farms would receive a payment "possibly today" for the March invoice, and that Peterson Farms would make a new shipment "of similar size" based on receipt of that payment.  It adds that the "[r]emaining past due will be paid on close of sale of business that is anticipated on 7-9-21."[13]

Something Sweet in fact paid that March invoice and Peterson Farms shipped cherries on June 23, 2021 despite the fact that, by that time, both the April and May invoices were outstanding and overdue.[14]  Knight testified at trial that, consistent with the statement in the email, when Peterson Farms shipped the cherries on June 23, it expected to receive payment for that shipment within the 30 days stated in the invoice.  Indeed, he explained that the payment was anticipated to be earlier than that – upon the sale of the business closing on July 9.[15]

## 2.    The Program

The Program is an eastern Pennsylvania-based distributor of frozen fruits and vegetables, licensed under PACA.[16]  It had been selling produce to Something Sweet since 1997.[17]  As of the filing of the Something Sweet bankruptcy, it was owed

---

[12] Loeb Ex. 6.

[13] *Id.*

[14] Aug. 15, 2025 Hr'g Tr. at 43.

[15] *Id.* at 49.

[16] *Id.* at 51, 53.  *See also* the Program Ex. 1.

[17] Aug. 15, 2025 Hr'g Tr. at 54.

$156,085.57 on account of eight separate shipments of produce that it made between October 2020 and January 2021.[18]

The Program's invoices state that the "perishable agricultural commodities listed on this invoice are sold subject to the statutory trust authorized by [section 5(c)] of the Perishable Agricultural Commodities Act."[19] They add that the "seller of these commodities retains a trust claim over these commodities, all inventories of food or other products derived from these commodities, and any receivables or proceeds from the sale of these commodities until full payment is received."[20] The invoices state that they are payable on "Net 30" terms and that a "Finance Charge of 1½% per month (18% per year) will be added to past due invoices."[21]

Paul Wagner, the president of the Program, testified that even though the Program would sometimes make a shipment to a customer that had one or more outstanding invoices that were more than 30 days old, the Program nevertheless "expected to be paid in 30 days on invoices every time we shipped them."[22] Wagner was cross-examined at trial about a statement he made in his deposition. There, he was asked whether it is "fair to say that the Program knew when you shipped the

---

[18] The Program Exs. 5, 6.

[19] The Program Ex. 6.

[20] *Id.*

[21] *Id.*

[22] Aug. 15, 2025 Hr'g Tr. at 81.

later orders that you would not get payment within 30 days."[23]  Wagner responded at his deposition that it "was absolutely known because it was already past 30 days."[24]

On redirect, however, Wagner made clear (as the context itself likely suggests, in any event) that the Program understood that the *old* invoices were already more than 30 days old and were not going to get any younger with the further passage of time.  So, when he agreed to the statement that the Program understood that "you would not get payment within 30 days," he was acknowledging that the Program was shipping new product despite the fact that the prior invoices were overdue.  He was not, however, agreeing that he ever shipped new product without expecting *that* invoice to be paid within 30 days.  Whenever the Program shipped product, Wagner's testimony was that we "expected to be paid in 30 days."[25]

### 3.    The Loeb Entities' Claim

The Loeb Entities are financing companies that buy, sell, appraise, and finance distressed manufacturing companies and their assets.  Howard Newman, the president of Loeb Equipment, testified that the Loeb Entities made a loan to Something Sweet secured by its existing equipment, and also facilitated Something Sweet's acquisition of additional equipment by purchasing it and leasing it to Something Sweet.[26]

---

[23] *Id.* at 83.

[24] *Id.*

[25] *Id.* at 88.

[26] *Id.* at 103-105.

Newman testified that the loan agreements required Something Sweet to keep the equipment that secured the Loeb Entities' loans in proper condition and gave the Loeb Entities the right to inspect the equipment.[27]  He noted that he conducted such an inspection in early 2021, after Something Sweet missed a loan payment.  He said that as of the time of his inspection, the equipment was in poor condition.  "[I]f the equipment is taken apart and no longer in line and thrown into a corner of a warehouse, it doesn't take an expert like myself to know that it's not functioning."[28]

As of the filing of the bankruptcy case, the "Loeb Entities have a valid, perfected, enforceable, and non-avoidable security interest in all assets of the Debtors, including all of the Debtors' machinery and equipment, and all accessions, accessories, attachments, spare parts, change parts, tooling, plant supporting equipment, platforms, piping, and electrical wiring related to the machinery and equipment."[29]  While the amount of the outstanding debt secured by this lien is unclear based on the existing record, that question (as described below) turns out not to matter to the resolution of the dispute now before the Court.

### 4.    The bankruptcy case

The debtors filed this case as a voluntary bankruptcy under chapter 11 on July 2, 2021.[30]  As of the time of the filing, the debtors had a general operating account

---

[27] *Id.* at 117-118.

[28] Aug. 15, 2025 Hr'g Tr. at 119.

[29] D.I. 76 at 4-5.

[30] The main bankruptcy case is Bankr. D. Del. No. 21-10992.  The docket of the main case is cited as "Main Case D.I. ___."

and a payroll account, both at Webster Bank.[31]  Between those accounts, the debtors had less than $6,000 in cash as of the petition date.

The debtors conducted an auction for the sale of substantially all of their assets in September 2021 at which Lyman Farms was the winning bidder.[32]  On October 15, 2021, the Court approved the sale to Lyman Farms for a cash purchase price of $925,000 (plus certain assumed liabilities).[33]  The sale proceeds were received by the debtors on October 18, 2021.[34]

On December 6, 2021, this Court entered an order converting the cases to ones under chapter 7.[35]  David Carickhoff was thereafter appointed as the chapter 7 trustee.[36]  On April 29, 2024, the trustee received a refund from a shipping company of approximately $15,000.[37]  After paying various administrative expenses, the trustee is now holding approximately $455,000.[38]

### 5.    Procedural background

Peterson Farms and the Program filed this adversary proceeding in October 2023.[39]  They named, as defendants, the debtors, the chapter 7 trustee, and the Loeb

---

[31] D.I. 76 at 5.

[32] Main Case D.I. 161.

[33] Main Case D.I. 186.

[34] D.I. 76 at 5.

[35] Main Case D.I. 250.

[36] Main Case D.I. 251.

[37] D.I. 76 at 6.

[38] *Id.*

[39] D.I. 1.

Entities (among others).[40]  The complaint primarily asserts that the funds held by the trustee are held in a PACA trust for their benefit and seeks an order directing that the funds be paid to them.[41]  In March 2024, the Court denied a motion by the Loeb Entities to sever the plaintiffs' claims and for a more definite statement.[42]  The Loeb Entities counterclaimed seeking a declaration that they, as the holders of a valid and perfected lien against the debtors' assets, were entitled to these funds.[43]

The case then appears to have gone into hibernation for some period while the parties apparently sought (unsuccessfully) to resolve the disputes out of court.  When the chapter 7 trustee expressed the concern that the delays in resolving the matter were requiring him to incur unnecessary expenses and were preventing him from closing the bankruptcy case, the parties agreed to a stipulation under which the trustee would agree to distribute the funds to whichever party prevailed in the adversary, but provided that the trustee and the estates could otherwise be dismissed from the action.[44]

In July 2025, this Court granted partial summary judgment in favor of the plaintiffs, finding that both plaintiffs are the beneficiaries of a PACA trust, and that both of their proofs of claim are deemed allowed.[45]  The Court denied the motion for

---

[40] *Id.*

[41] *Id.*

[42] *See* D.I. 20 (letter ruling); D.I. 21 (order).

[43] D.I. 22.

[44] D.I. 40, 44, 46.

[45] D.I. 67.

summary judgment on all remaining issues and conducted a one-day bench-trial on August 15, 2025.  After trial, both parties submitted post-trial briefs.[46]

## Jurisdiction

The question of the Court's subject-matter jurisdiction over this dispute is perhaps more complicated than it might appear.  The complication is that the premise of PACA is that the statute creates a statutory trust for the benefit of the produce supplier, and that any party holding such funds has only nominal title thereto, with beneficial ownership belonging to the produce suppliers.  Viewed through that lens, one could view the dispute as one among non-debtor entities (the produce suppliers and the Loeb Entities), arising under non-bankruptcy law, over which party owns assets in which the bankruptcy estate has no interest.  When viewed that way, one could see the issue as one that is outside the subject-matter jurisdiction under 28 U.S.C. § 1334.

There are, however, two potential solutions to this jurisdictional problem.  *First*, the dispute may be viewed as one over the allowance of the claims filed by the plaintiffs, and whether those claims are themselves secured by the assets held in the PACA trust.  In that event, the Court would also have "arising under" subject-matter jurisdiction over the claims allowance dispute (under §§ 502 and 506 of title 11).  *Second*, one could view the dispute as being about *whether* the bankruptcy estate has an interest in the funds in the trustee's possession.  Viewed that way, the claim can

---

[46] D.I. 82, 84.  The parties' motions for leave to file such briefs in excess of the applicable page limits (D.I. 83 and 85) will be granted.

be understood to be one that "arises under" § 541 of the Bankruptcy Code and therefore fall within the Court's "arising under" jurisdiction of § 1334(b).  The Court is satisfied that these are proper ways in which to understand the dispute and will proceed on that basis.

## Analysis

The Third Circuit has explained that "Congress enacted PACA in 1930 to deter unfair business practices and promote financial responsibility in the perishable agricultural goods market."[47]  The statute established a regime of licensing, and "was designed primarily for the protection of the producers of perishable agricultural products—most of whom must entrust their products to a buyer or commission merchant who may be thousands of miles away, and depend for their payment upon his business acumen and fair dealing."[48]

The provisions relevant here were added in the 1984 amendments to PACA. Those amendments "allow for a non-segregated floating trust for the protection of producers and growers."[49]  The Third Circuit quoted the statute's legislative history which explained that the amendment provides "a remedy by impressing a trust in favor of the unpaid seller or supplier on the inventories of commodities and products derived therefrom and on the proceeds of sale of such commodities and products."[50]

---

[47] *Weis-Buy Servs., Inc. v. Paglia*, 411 F.3d 415, 419 (3d Cir. 2005).

[48] *Id.* at 419-420 (internal citations and quotations omitted).

[49] *Id.* at 420.

[50] *Id.* (quoting H.R. Rep. 98-543, reprinted in 1984 U.S.C.C.A.N. 405, 406).

The Second Circuit's decision in *In re Kornblum* explains how this "non-segregated floating trust" works.  The court there explained that the buyer of produce "is required to hold the Produce and its derivatives or proceeds in trust for the unpaid seller."[51]  This statutory trust operates under ordinary principles of trust law. Accordingly, the buyer of the produce holds "the legal title to the Produce and its derivatives or the proceeds but the seller retains an equitable interest in the trust property pending payment."[52]  In the event of a buyer's bankruptcy, the trust assets are excluded from the bankruptcy estate.[53]  Indeed, the Bankruptcy Code says exactly that: "Property in which the debtor holds … only legal title and not an equitable interests … becomes property of the estate … only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold."[54]  For that reason, as *Kornblum* explains, a "PACA trust beneficiary is thereby entitled to claim trust property ahead of even creditors holding security interests in the property."[55]

But what is trust property?  *Kornblum* rejected the argument that a PACA claimant was required to show that the assets against which it sought to recover were the specific proceeds of the produce supplied by that beneficiary.  Rather, it held that

---

[51] *In re Kornblum & Co., Inc.*, 81 F.3d 280, 284 (2d Cir. 1996).

[52] *Id.*

[53] *In re Long John's Silver's Restaurants, Inc.*, 230 B.R. 29, 32 (Bankr. D. Del. 1999); *United States v. Whiting Pools, Inc.,* 462 U.S. 198, 205 n. 10 (1983) ("Congress plainly excluded property of others held by the debtor in trust at the time of the filing of the petition.")

[54] 11 U.S.C. § 541(d).

[55] *Kornblum*, 81 F.3d at 284.  *See also Consumers Produce Co. v. Volante Wholesale Produce,* 16 F.3d 1374, 1379 (3d Cir. 1994).

"a single PACA trust arises upon the sale of Produce on credit" to a buyer.[56] "Upon the occurrence of subsequent sales of Produce to that Produce Debtor on credit, new unpaid Produce suppliers join the undifferentiated pool of trust beneficiaries, and the Produce purchased from these suppliers becomes the property of the single PACA trust."[57]

In light of that determination, the Second Circuit adopted a burden shifting analysis that the parties agree is applicable here. Once it is established that a PACA trust has come into existence, a party contending that particular assets are *outside* of that trust bears the burden of proving one of three things: "that (1) no PACA trust existed when [the assets in question] were purchased; (2) even though a PACA trust existed at that time[,] the [assets in question] were not purchased with trust assets; or (3) although a PACA trust existed when [the assets] were purchased and the [assets] were purchased with trust assets, [the debtor] thereafter paid all unpaid sellers in full prior to the transactions involving" the creditors at issue.[58]

## I.    The plaintiffs did not waive the PACA protections by their course of dealings.

The Loeb Entities first argue that the plaintiffs have, through a course of dealing, waived the protections afforded to them by PACA.[59] A condition of a PACA trust is that the

---

[56] *Kornblum*, 81 F.3d at 285.

[57] *Id.*

[58] *Id.* at 287.

[59] D.I. 82 at 4-11.

produce supplier require payment within 30 days of shipment.[60]  The Loeb Entities' argument is that by continuing to ship produce despite the fact that they had outstanding invoices that were more than 30-days old, the plaintiffs implicitly agreed that payment on terms that were longer than the "net 30 days" stated on their invoices would be acceptable.  That argument is unsuccessful.

It is true that before 2011, federal courts had invalidated the trust rights of unpaid creditors who had agreed, either in writing or through an oral agreement, to accept payments from the creditor that were overdue.[61]  The courts reasoned that these agreements extended payment terms beyond 30 days.[62]  But regulations adopted by the United States Department of Agriculture in 2011 clarify that the prohibitions on extensions of payment terms beyond 30 days applies only to *pre-transaction* agreements.  A *subsequent* agreement under which a supplier agrees to work with a purchaser to renegotiate payment terms does not operate to waive the PACA trust.[63]

As described above, the record here shows that the plaintiffs shipped new produce despite the fact that they had invoices that had been outstanding for more than 30 days.  But

---

[60] 7 C.F.R. § 46.46(e)(2) ("The maximum time for payment for a shipment to which a seller, supplier, or agent can agree, prior to the transaction, and still be eligible for benefits under the trust is 30 days after receipt and acceptance of the commodities as defined in § 46.2(dd) and paragraph (a)(1) of this section.")

[61] *See Patterson Frozen Foods, Inc. v. Crown Foods, Int'l*, 307 F.3d 666, 672 (7th Cir. 2002); *Greg Orchards & Produce, Inc. v. Roncone.*, 180 F.3d 888, 892 (7th Cir. 1999); *Idahoan Fresh v. Advantage Produce, Inc.*, 157 F.3d 197, 205 (3d Cir. 1998); *In re Lombardo Fruit and Produce Co.*, 12 F.3d 806, 809 (8th Cir. 1993); and *Hull Co. v. Hauser's Foods, Inc.*, 924 F.2d 777, 781-82 (8th Cir. 1991).  *See also* Perishable Agricultural Commodities Act: Impact of Post-Default Agreements on Trust Protection Eligibility, 76 Fed. Reg. 70, 20217 (Apr. 12, 2011) (codified at 7 C.F.R. § 46.46).

[62] *See id.*

[63] *Id.* at 20218.  *See also* 7 CFR § 46.46(e)(3) ("if there is a default in payment … the seller, supplier, or agent who has met the eligibility requirements of paragraphs (e)(1) and (2) of this section will not forfeit eligibility under the trust by agreeing in any manner to a schedule for payment of the past due amount or by accepting a partial payment.")

there is nothing in the record to suggest that either plaintiff ever agreed in advance of making a shipment that the invoice for that shipment could be paid on terms that are longer than the "net 30" terms set forth on the invoice.  Rather, the evidentiary record demonstrates that the plaintiffs, upon making each shipment, required and expected that Something Sweet would pay that invoice within 30 days.  The record accordingly does not support a finding that the plaintiffs waived the protections of the PACA trust by agreeing to payment terms that were longer than 30 days.

## II.    The record establishes that a PACA trust existed throughout the relevant period.

The Loeb Entities argue that although the Program had been selling produce on credit to the debtors since May 2003, there is no evidence that there were *unpaid* invoices, and therefore a valid PACA trust, in existence before October 23, 2020, which is the date of the first *unpaid* invoice in the record here.[64]  The Loeb Entities' collateral, on the other hand, would have been owned by the debtors before the Loeb Entities made their 2019 loan.[65]

The trial record before the Court contains evidence, in the form of invoices, showing that perishable agricultural products were sold to the debtors on credit going back to 2003.[66]  It is true that those invoices were marked as "paid."  But under PACA and the rationale set forth in *Kornblum*, once the claimants establish the existence of a PACA trust, the Loeb Entities bear the burden of showing that the trust terminated through the payment, in full, of all invoices owed to the beneficiaries of

---

[64] D.I. 82 at 11-14.

[65] *See* JX-12 at 4-5 (cash collateral order identifying the Loeb Entities' collateral).

[66] The Program Exs. 2, 3.

16

the PACA trust. Nothing in the record before the Court, however, establishes from how many produce suppliers the debtors purchased agricultural products, let alone that there was ever a time after 2003 when all such suppliers had been paid in full on their invoices. While the Loeb Entities fault the claimants for failing to produce all of their historical invoices and payment records in discovery, to meet their burden of proof on this issue, the Loeb Entities would have been required to obtain the *debtors'* historical records to prove that there was a point in time when *all* produce suppliers had been paid in full. And while the Court appreciates the practical challenges associated with obtaining such historical information in the context of a chapter 7 bankruptcy case, nothing in the record before the Court demonstrates that the Loeb Entities even sought to obtain such information. In any event, based on the evidentiary record before the Court, the Loeb Entities have failed to meet their burden of showing that the PACA trust had terminated.

### III. The record supports the conclusion that all of the funds in the trustee's possession are held in a PACA trust.

The Loeb Entities further argue that the funds now being held by the trustee are not proceeds of the sale of produce, and thus fall outside the PACA trust.[67] The funds held by the trustee, the parties have stipulated, derive from the sale of substantially all of the debtors' assets to Lyman Farms and a refund due to a freight reduction error.[68]

---

[67] D.I. 82 at 15-28.

[68] D.I. 76 at 6.

The Loeb Entities rely heavily on a spreadsheet that lists the assets that Lyman Farms acquired in its purchase of the debtors' assets.[69]  The Loeb Entities argue that the bulk of the value in the § 363 sale was attributable to the equipment, which they contend is outside of the PACA trust because "such equipment was purchased by the Debtors long before the PACA claims in question."[70]

Even if this were the case, if the equipment had been maintained with funds held in trust, then the value attributable to that maintenance would belong to the trust.  Appreciating that fact, the Loeb Entities emphasized at trial that the equipment had been poorly maintained, presumably in support of their contention that all of the value of the equipment derived from the funds originally used to purchase it.  The problem for the Loeb Entities' argument, however, is that their claim that the funds used to purchase the equipment were not impressed with a trust boils down to little more than a rehash of their prior argument that no valid trust existed until 2021.  The record here, however, shows the existence of a PACA trust dating back to 2003.  And the Loeb Entities have not met their burden of showing the existence of any point in time thereafter when that trust no longer existed.  That record accordingly requires the Court to draw the inference that at least some of the funds used to purchase the equipment in question were funds that were held in a PACA trust, which is sufficient to make the equipment trust property.

---

[69] Loeb Ex. 12.

[70] D.I. 82 at 18.

To be sure, under *Kornblum*, the existence of a trust does not preclude the Loeb Entities from seeking to establish that particular assets were acquired with funds on which no trust had ever been impressed and therefore fall outside the scope of the PACA trust.  The record before the Court, however, does not support any such finding.  The Loeb Entities have not established that at the time of their 2019 loan, they took steps to ensure that the assets in which they took a security interest had been acquired by the debtors with funds that fell outside the ambit of any then-existing PACA trust.  Nor did they require that their collateral be maintained with segregated funds, or that the proceeds of their loan be held in a segregated account.  Rather, the record reveals that the debtors maintained two bank accounts into which all sale proceeds were deposited.[71]

Nor is there a basis to distinguish the freight refund from the proceeds of the asset sale.  To the extent that the overpayment was made with funds that were held in trust, then the rebate is similarly a trust asset.  The Loeb Entities have not presented evidence sufficient to meet their burden of proving that any of the funds now held by the trustee fall outside the scope of the PACA trust.

## IV.  This application of PACA does not violate the constitutional right to due process or amount to an unconstitutional taking.

The Loeb Entities argue that if PACA operates in the way that the plaintiffs contend, then PACA violates their right under the Fifth Amendment as a deprivation

---

[71] D.I. 76 at 5.

of their property rights without due process and/or a constitutional taking.[72]    It is true, as the Loeb Entities argue, that a security interest is a form of property interest entitled to constitutional protection and that the Bankruptcy Code was written with those concerns in mind.[73]

Nevertheless, whether viewed through the lens of substantive due process or the Takings Clause, the constitutional challenge to PACA fails.  The provisions of PACA creating the statutory trust were enacted in 1984.  Under the Takings Clause, the Supreme Court has placed particular emphasis on whether a party challenging an act of Congress as a taking can establish that the challenged legislation interferes with the party's "reasonable investment backed expectations."[74]  The Loeb Entities cannot.  By the time of their loan in 2019, it was settled law that the beneficiaries of a PACA trust were granted priority over the holder of an otherwise valid security interest in assets that were held in trust.[75]  Accordingly, there can be no contention

---

[72] D.I. 82 at 28-33.  Notwithstanding the command of Fed. R. Civ. P. 5.1 (made applicable hereto under Fed. R. Bankr. P. 7005), the Loeb Entities do not appear to have notified the Attorney General of this constitutional challenge to an Act of Congress in order to afford the United States its right to intervene to defend the statute.  *See* 28 U.S.C. § 2403(a).  Indeed, if the challenge were a substantial one, the Court would itself have an obligation to so certify the question under § 2403(a).  For the reasons set forth herein, however, it is not.  It bears note that while the Loeb Entities also argue that the application of PACA raises questions under the Fourteenth Amendment, that provision applies only to the states, not the federal government, and therefore has no application here.  *See Bolling v. Sharpe*, 347 U.S. 497, 498-499 (1954).

[73] *See Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 601-602 (1935); *United States v. Security Indus. Bank*, 459 U.S. 70, 75-27 (1982).

[74] *Eastern Enter. v. Apfel*, 524 U.S. 498, 523 (1998).  The *Eastern Enterprises* Court further noted that the "analysis of legislation under the Takings and Due Process Clauses is correlated to some extent." *Id.* at 537.

[75] *See Consumers Produce,* 16 F.3d at 1379.

that the Loeb Entities would have a reasonable investment-backed expectation, in 2019, that their security interest in Something Sweet's assets would have priority over the beneficiaries of a PACA trust.  The Loeb Entities' constitutional challenge to the trust provisions of PACA accordingly fails.

## V.   Both plaintiffs are entitled to prepetition and post-petition interest; those claims for interest exhaust the funds in the trustee's possession.

The Loeb Entities finally argue that the plaintiffs are not entitled to attorneys' fees or interest.[76]  There is no serious dispute about the plaintiffs' right to *prepetition* interest.  Under § 502(b) of the Bankruptcy Code, a proof of claim filed by a creditor is deemed allowed in the absence of the claim being unenforceable under non-bankruptcy law, or some other statutory basis for disallowance.[77]  The invoices here state that interest accrues at the rate of 1.5 percent per month (18 percent annually).  The Court understands such a provision to provide for interest that accrues on a simple (rather than compounding) basis at the rate of 18 percent per year.  The parties squabbled at trial over the admissibility of documents containing the parties' interest calculations.  But where the amount owed, interest rate, and time period are established by the evidence, the actual mathematical calculation of the interest can be conducted by the court.  "Evidence" of the calculation is unnecessary.[78]  That calculation is set forth in Appendix A to this Memorandum Opinion.  The amounts

---

[76] D.I. 82 at 33-44.

[77] *Travelers Cas. & Sur. Co. of Am. v. Pacific Gas & Elec. Co.*, 549 U.S. 443, 449 (2007).

[78] *See Kosnoski v. Howley*, 33 F.3d 376, 379 (4th Cir. 1994); *SEC v. Carrillo*, 325 F.3d 1268, 1272 (11th Cir. 2003).

due as of the petition date, including prepetition interest at 18 percent per annum, comes to approximately $300,000.[79]

The Loeb Entities raise two arguments, however, that bear on whether the plaintiffs are entitled to *post-petition* interest or fees.  *First*, the *Loeb* entities argue that awarding fees and interest would be inequitable.  They point to principles that trace their roots to the Supreme Court's decision in *Pepper v. Litton* to suggest that because bankruptcy courts are courts of equity, this Court has the authority to deny claims for fees and interest that the Court considers unfair or unjust.[80]

That is not the law.  To be sure, the Bankruptcy Code codified a broad area of law that was previously addressed through principles that were more equitable than legal.  In codifying these principles, the drafters of the Code brought forward that equitable tradition by granting bankruptcy courts the powers provided in § 105(a) to issue appropriate orders to carry out the Code's purposes.  That authority is real and important and gives courts the ability to effectuate the Code's purposes when addressing interstitial matters that are not resolved by the language of the Code itself.[81]

---

[79] The district court's opinion in *In re Fleming Companies, Inc.*, 316 B.R. 809 (D. Del. 2004), makes clear that when an invoice provides for prejudgment interest, that interest is itself protected by the PACA trust.  "Once included in the agreement, the interest is explicitly connected to the sales transaction.  If successful, these plaintiffs are entitled to prejudgment interest at the rate cited in the sales contract."  *Id.* at 817.

[80] *See generally Pepper v. Litton*, 308 U.S. 295 (1939).

[81] This was the basis of the Third Circuit's decision in *In re Kaiser Aluminum Corp.*, 456 F.3d 328, 340 (3d Cir. 2006), on which the Loeb Entities rely.

But to the extent there was ever any suggestion that this included a generalized power for bankruptcy courts to adjust parties' rights according to their own sense of what is equitable, the Supreme Court resolved that matter in *Law v. Siegel*, where it held that whatever § 105(a) may mean, it provides no authority to disregard the text of the Bankruptcy Code.[82]

The Loeb Entities seek to distinguish that authority on the ground that the plaintiffs here are invoking rights that are contractual rather than the statutory rights at issue in *Law v. Siegel*. That is a distinction without a difference. There is no greater right to adjust a party's legal entitlement when that entitlement is based on a contract than on a statute. And in any event while § 502(b) of the Bankruptcy Code (which addresses claims allowance) incorporates parties' contractual rights, it is itself a statutory provision in the same way that § 522(k) (the provision at issue in *Law v. Siegel*) was.

This is not to exclude the possibility that in truly exceptional circumstances, a court could not find that extraordinary facts may warrant an invocation of the court's residual equitable powers. But there is nothing extraordinary here. Sure, an 18 percent rate of interest is a high one. And yes, this case went on for longer than might have been necessary, allowing that interest to accrue for a long time. But this Court sees no principled basis on which it would replace the contractual rate of interest with one of its own choosing. And in the Court's view, the parties to this case are equally responsible for the fact that the resolution of this case took longer than anyone might

---

[82] 571 U.S. 415 (2014).

have preferred.  Accordingly, even if there is a power in exceptional circumstances to invoke the court's equitable powers to alter the terms agreed between the parties, the Court sees no basis for doing so here.

*Second*, the Loeb Entities argue that while § 506(b) of the Bankruptcy Code provides that *oversecured* creditors are entitled to post-petition interest, the Code contains no such provision permitting *unsecured* creditors the right to post-petition interest.[83]  To the contrary, § 502(b)(2) provides that claims for interest that have not matured as of the petition date are generally disallowed.  Accordingly, one might conclude that the plaintiffs' allowed claims against the bankruptcy estate (like those of other similarly situated unsecured creditors) are limited to their principal plus prepetition fees and interest.  On this theory, the plaintiffs' claims for interest that had not matured as of the petition date would be disallowed under § 502(b)(2).

In the discussion of subject-matter jurisdiction, the Court noted that the dispute before it may be viewed as a question of claims allowance.  Even viewed that way, however, the Court concludes that the plaintiffs are entitled to post-petition fees and interest up until the point at which the claims exceed the amounts held by the trustee.  The reason for that is that when one works one's way through the Bankruptcy Code's definitions, the plaintiffs' claims are best understood as being

---

[83] *See also In re Tribune Media Co.*, No. 08-13141 (KJC), 2015 Bankr. LEXIS 3973, *11 (Bankr. D. Del. Nov. 19, 2015).  For the purposes of this discussion, the "solvent debtor's exception" addressed by the Third Circuit in *In re Hertz Corp.*, 120 F.4th 1181 (3d Cir. 2024), is inapposite.

secured by the amounts held in the PACA trust.  They are accordingly entitled to post-petition fees and interest under § 506(b).

Specifically, § 506(a) states that "an allowed claim of a creditor secured by a *lien* on property in which the estate has an interest … is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property."[84]  The term "lien," is also defined by the Bankruptcy Code.  A lien is a "charge against or interest in property to secure payment of a debt or performance of an obligation."[85]

The statutory trust that arises under PACA satisfies this definition of the term "lien."  The effect of a PACA trust, after all, is to grant unpaid produce suppliers an interest in those assets that are held in trust.  Indeed, the Third Circuit has essentially said as much.  "In essence, PACA's trust provision gives the unpaid supplier an interest in the trust corpus superior to the interest of any other lien or secured creditor."[86]

Otherwise put, the bankruptcy estate's "legal interest" in the trust assets permits the bankruptcy trustee to liquidate those assets and distribute their proceeds to the beneficiaries of the PACA trust.  So understood, the value of the estate's interest in those assets exceeded the amount of the plaintiffs' interest in those assets as of the petition date.  The PACA claimants thus held "secured" claims under

---

[84] 11 U.S.C. § 506(a) (emphasis added).

[85] 11 U.S.C. § 101(37).

[86] *See In re Magic Restaurants, Inc.*, 205 F.3d 108, 112 (3d Cir. 2000).

§ 506(a) as of the petition date, and under § 506(b) are entitled to post-petition fees and costs up until those claims exhaust the amounts held by the trustee.

In fairness, however, there is a counterargument. Because a claim is secured only to the extent of the creditor's interest *in the estate's interest* in the property that secures the claim, one might say that the *estate's* interest in the funds held in a PACA trust is limited to the bare legal title to those funds. In that case, the asset in question (bare legal title to the funds) would have little value, and the PACA claimants would *not* be oversecured creditors.

But even so, one would reach the same result by another route. In that event, the plaintiffs would still have an equitable interest in those funds. And as described above, under PACA, interest would continue to accrue on the obligation that is entitled to the protection of the trust.[87] Understood this way, the dispute now before the Court is simply a question arising under § 541 over the metes and bounds of the property of the estate. And the conclusion is that the principal amounts due to the PACA claimants, plus the interest that they are owed under the parties' agreements, consumes all of the funds that the trustee is holding. Accordingly, all of the funds held by the trustee are subject to the PACA trust. The PACA claimants are the beneficiaries of that trust. The estate has no equitable interest in any of those funds.

Finally, Peterson Farms asserts that it is entitled to attorneys' fees and reserve the right to prove up the amount of those fees.[88] But unlike when a party is entitled

---

[87] *See Fleming Companies*, 316 B.R. 809.

[88] D.I. 84 at 10. *See also* Peterson Ex. 1 at p. 0008.

to fees under a fee-shifting statute or as a sanction, Peterson Farms' right to fees is simply part of its claim.  As such, it had the burden of demonstrating those amounts at trial.  Having presented no evidence with respect to those fees, it has failed to meet its burden of demonstrating that element of its claim.[89]

## Conclusion

For the foregoing reasons, the Court concludes that the amounts held by the trustee are held in trust for the plaintiffs and should be distributed to the plaintiffs, *pro rata*.  As set forth in Appendix A, as of the date of this Memorandum Opinion, Peterson Farms is entitled to 44.43 percent of those funds; the Program is entitled to 55.57 percent.  The parties are directed to settle an appropriate form of judgment, resolving this adversary proceeding, so providing.

Dated: October 20, 2025

_____
CRAIG T. GOLDBLATT
UNITED STATES BANKRUPTCY JUDGE

---

[89] The plaintiffs also argued that the Loeb Entities failed to prove the amounts owed to them on their loan.  In light of the disposition described above, the Court need not reach that issue. It bears note, however, that the chapter 7 trustee in this case took the position that any funds that were not held in trust for the PACA claimants should be distributed to the Loeb Entities on account of their secured claims.  It therefore is not obvious that the Loeb Entities had any further reason or obligation to prove up the amount of their debt in this proceeding.